385 P.2d 230

**CITY OF GLENDALE, a municipal corporation, Appellant,**

v.

**William BARCLAY, Robert G. Skok, Jack E. West, Loren Sederstrom, M. T. Donato, Sam J. Bartaluzzi and Donald P. Woods, Appellees.**

No. 7460.

Supreme Court of Arizona.

In Division.

Sept. 18, 1963.

Kenneth Biaett, Phoenix, for appellant.

D. Kelly Turner, Scottsdale, for appellees, Robert G. Skok, Jack E. West, M. T. Donato and Sam J. Bartaluzzi.

Lewis, Roca, Scoville, Beauchamp & Linton, Phoenix, for appellees, Donald P. Woods and Loren Sederstrom.

Trew, Woodford & Dodd, Phoenix, for appellee, William Barclay.

LOCKWOOD, Justice.

The City of Glendale appeals from a judgment dismissing its suit for breach of contract against William Barclay and six other defendants, hereafter referred to as the appellees. For the purposes of this appeal, the well-pleaded material allegations of the complaint and all inferences which reasonably may be drawn therefrom are taken as admitted. Long v. Arizona Portland Cement Company, 89 Ariz. 366, 362 P.2d 741 (1961).

The City entered into a written contract with the appellees on January 7, 1958. This agreement contained the following terms: The appellees contemplated the subdivision of certain land near Glendale and the construction of a shopping center and 250 homes upon it. Since they desired having the City extend sewer trunk lines to serve the property, the appellants promised to build and connect to the sewerage facilities not less than 250 houses within the next eighteen months. The appellants also promised to pay the City each month an amount equal to $1.50 per month for each house less than 250 not built within the time limit.[1] The appellants agreed to continue these payments until 250 houses had been built and connected to the sewerage facilities. Thereafter, payments would be due from the individual users. In return, the City agreed to issue bonds in the amount of $1,500,000 for the purpose of building a sewerage disposal plant and laying the required sewer mains.

The City issued the bonds and constructed the sewerage facilities as agreed. Several months later, the land was conveyed and the contract was assigned to the Elson Development Company. At the end of the eighteen month period, only thirty-three houses had been built and connected to the sewer line.

The City then brought suit for breach of contract against the appellees, asking damages equal to $1.50 per month for each proposed house not yet constructed. Ruling that the Elson Development Company was a necessary party, the trial judge granted a motion to dismiss the City's complaint without prejudice. So the City filed an amended complaint, joining the appellees

1. This provision of the contract reads: "Co-tenants [the appellees] agree: * * * 14. To build and connect to said sewerage facilities not less than 250 houses within eighteen months after the effective date of this contract or that in lieu thereof the Co-tenants [the appellees] will pay to the City each month an amount equal to $1.50 per month for each house less than the said 250 houses connected to said sewerage facilities, and shall continue such monthly payments until the houses built and connected to said sewer equal 250 in number. Thereafter payment shall be due from the individual users in conformity with the effective schedule at all times."

and the Elson Development Company as defendants. The trial judge then granted appellees' motions to dismiss for failure to state a claim for which relief could be granted.[2] The City appealed.

The sole issue before this court is the sufficiency of the City's claim against appellees. Did the contract manifest an intention to discontinue the liability of the original covenantors after assignment? In response to this question, two conflicting constructions of the contract are offered this court by the parties. The appellees contend the covenant ran with the land, shifting liability for performance from the appellees to the present owner, the Elson Development Company. The City, on the other hand, contends that, even though the covenant may have run with the land, the original covenantors remain liable.

The rule is well established that a real covenant creates in the covenantor a contractual duty which cannot be escaped simply by transferring the property to another. The question of the continued liability of the covenantor after assignment turns upon the express or presumed intention of the parties to the contract. In the absence of an express provision, their intention should be determined from the language of the entire contract, giving due consideration to the surrounding circum-

stances. Pratt-Low Preserving Co. v. Evans, 55 Cal.App. 727, 204 P. 241 (1922); Proctor v. Union Coal Co., 243 Mass. 428, 137 N.E. 659 (1923); 2 Casner, American Law of Property, § 9.18; 4 Corbin on Contracts, § 864; 15 C.J. Covenants, p. 1261; 21 C.J.S. Covenants § 86.

Turning our attention to the contract in this case, we find no express provision dealing with the liability of the original covenantors in the event of an assignment. The appellees assert, however, that two clauses in the contract "indicate a clear intention that the obligation shall run with the land and that only those landowners at the time of a breach shall be liable therefor." We disagree. These clauses provide:

"21. The Co-tenants [the appellees] may from time to time convey portions of the property to other persons, provided that the terms and conditions of this agreement shall be a condition of any such conveyance.

"22. Time shall be of the essence of this agreement, and the provisions hereof shall be binding upon the parties hereto, their heirs, executors, administrators, successors, or assigns."

These clauses indicate that any future conveyance or assignment will include the terms and conditions of the agreement. But this language does not limit the con-

---

2. The Elson Development Company did not join in appellees' motions to dismiss and is not a party to this appeal

**362**

tinued liability of the original covenantors. On this point, the central consideration in this case, a basic ambiguity exists in the language of the contract. Consequently, it is necessary for us to consider other possible indications of their intention: the nature of the covenant, the nature of the performance, and the length of time for the performance.

■ The nature of the covenant in this case indicates that the City may have relied heavily upon the personal credit and standing of the appellees. Otherwise, the City might have been more reluctant to issue $1,500,000 in bonds and to construct the sewerage facilities. This reliance element can also be seen in cases involving leases. The mere fact that the lessee assigns the remainder of his term does not extinguish his obligation to perform his covenants in the lease. DeHart v. Allen, 26 Cal.2d 829, 161 P.2d 453 (1945); 1 Tiffany, Landlord and Tenant, 944. In lease cases, the courts stress the personal contractual relationship between the landlord and the original tenant. This emphasis is consistent with the intention of the parties who understand that the lessor relies heavily upon the personal credit of the lessee-covenantor. 2 Casner, American Law of Property, § 9.18. Similarly, the City in the instant case may have been greatly influenced by the financial status of the appellees. This would indicate an intention that appellees were to remain personally liable after the assignment.

Another factor revealing the intention of the parties to this contract is the nature of the performance promised. Restatement, Property § 538, comment c. (1944). The fact that the promise to build houses can only be performed by the landowner, however, does not lead inevitably to the conclusion that the original parties must have intended to release the appellees from liability if they parted with the land. Pratt-Low Preserving Co. v. Evans, 55 Cal.App. 724, 204 P. 241 (1921), involved a contract for the sale and purchase of all the fresh fruit to be grown on specific land for a period of twelve years. In spite of an express provision that the covenant should run with the land, the court held that it did not run and that the original covenantor, who had parted with the title, remained liable on his contract. The court stated 204 P. at 243:

"But if it may be said that, as between appellant and respondent, said provision should be considered as though creating a covenant running with the land, then the general rule would apply that the original covenantor continues to be bound after the sale. Coburn v. Goodall, 72 Cal. 498, 14 Pac. 190, 1 Am.St.Rep. 75; Stanislaus Water Co. v. Bachman, 152 Cal. 716, 93 Pac. 858, 15 L.R.A.(N.S.) 359;

15 Corpus Juris, p. 1301; Code Commissioner's note to section 1457, Civil Code.

"But, whether any effect can be given to said provision, it is at least plain that the parties did not therein use language that is susceptible of the construction that the defendant's obligation was to cease upon the transfer. It may be, as suggested by respondent, that after the sale it would be difficult for him to supply the peaches, but he should have anticipated that difficulty and made provision for it in the contract. That by his sale he had, indeed, made it difficult or even impossible to carry out his agreement is no defense to the action." Klauber v. San Diego Street-Car Co., 95 Cal. 353, 30 P. 555.

See also Proctor v. Union Coal Co., 243 Mass. 423, 137 N.E. 659 (1923). Moreover, while the appellees may have made it difficult or impossible for themselves to perform their promise to build houses by transferring the land, their promise to make payments to the City can be performed independently of the possession of the land. See Restatement, Property § 538, comment c.[3]

■■ The intention of the parties to a contract may also be indicated by the length of time the obligation will continue. Pratt-Low Preserving Co. v. Evans, supra; Sexauer v. Wilson (1907), 135 Iowa 357, 113 N.W. 941, 14 L.R.A.,N.S., 185, 15 Ann.Cas. 54; Hickey v. Lake Shore & M. S. Ry., 51 Ohio St. 40, 36 N.E. 672, 23 L.R.A. 396 (1894). In Hickey, for example, the grantee covenanted that he, his heirs, and assigns would build and maintain fences along the right of way. This condition and obligation was to be perpetually binding on

3. Restatement, Property § 538. "CONTINUING OBLIGATION OF PROMISOR. Whether a promise respecting the use of land of the promisor will continue to bind the promisor after he had ceased to have an interest in the land with respect to which the promise was made depends upon the intention manifested in the making of the promise. * * * c. INTENTION INFERRED FROM NATURE OF ACT PROMISED. One of the most significant of the circumstances leading to an inference as to the intention with respect to the continuance of the obligation of one who has made a promise respecting the use of his land after he has parted with the land is the nature of the act promised. If the promisor promises that certain acts will be performed upon his land, or that certain uses will not be made of it, it is less likely that the parties intended a continuing obligation on his part than is true where the promisor promises to pay in ways other than by the use of his land for benefits received in the use of it. In the latter case, the act promised can be performed independently of the possession of the land. Moreover, there is in such a case a greater reliance by the promisee upon the personal credit of the promisor than is true in the case of a promise that land will be used in a certain way. Hence, there is less likelihood of an intention to create a continuing obligation in the case of a promise to pay in ways other than by its use for a benefit received or to be received in its use.

the owners of the land. The court held that subsequent grantees were liable on the covenant, but that the original covenantor's liability had ceased upon transfer, basing the decision on the presumed intention of the parties. The court said 36 N.E. at 675:

"Manifestly, it was not Hickey's intention to assume an obligation in perpetuam, and after having sold and conveyed the premises in fee, to remain bound for life, and his heirs to be bound after his death, to build and keep up the fences between the right of way and the land sold; and in getting at the intention of the railway company the obvious inference would be that the company would naturally provide for a recourse to those who might own the land at the time the fences needed repairing or rebuilding, rather than to its grantee and his heirs, who might, perhaps, at the time be dead, or unable to be found. We cannot but conclude that the company intended, when the land was conveyed, to trust to the land and its owners for a performance of the condition contained in the deed, and not to its grantee after he ceased to be the owner."

The contract in the instant case, however, had a fixed time limit of eighteen months on the promise to construct 250 houses. So far as the promise to make payments "in lieu of thereof" is concerned, it is not likely that the parties would have entered such an agreement if they thought performance would be prolonged. The City had to meet the obligation imposed by the bond issue and the appellees would not be able to delay their business venture. Indeed, the parties provided that "time shall be of the essence of this agreement." Unlike the Hickey Case, there can be no inference in the instant case that the City intended "to trust to the land." An understanding to build 250 houses is not one which the City would expect to be performed by *any* owner of the land. The personal credit and standing of the appellees must have greatly influenced the City.

We hold that the contract does not manifest an intention to discontinue the liability of the original promisors. The trial judge improperly dismissed the City's complaint against the appellees.

Reversed and remanded for further proceedings not inconsistent with this opinion.

BERNSTEIN, C. J., and JENNINGS, J., concur.